# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GUS A. PALOIAN, not individually but solely in his capacity as the Chapter 7 Trustee of GGSI Liquidation, Inc., *et al.*, | ) ) ) ) | |
| Plaintiff/Appellee/Cross-Appellant, | ) ) | |
| v. | ) ) | Case No. 07 C 396 |
| GRUPO SERLA S.A. de C.V. a/k/a Grupo Empresarial Serla, S.A. de C.V.; EDITORIAL COMERCIAL, S.A. de C.V.; SERGIO EDWARDO GUARNEROS TRUJILLO; J.P. MORGAN CHASE BANK, N.A., individually and as successor-in-interest to First National Bank of Chicago, a national banking Association; and UNION INDUSTRIAL MEXICANA, S.A. de C.V., | ) ) ) ) ) ) ) ) ) ) | Adversary No. 03 A 03888 |
| Defendants/Appellants/Cross-Appellees. | ) | |

## OPINION AND ORDER

This case arises from the appeals of defendant/appellant/cross-appellee J.P. Morgan Chase Bank, N.A., successor by merger to Bank One, N.A. ("the Bank"), and plaintiff/appellee/cross-appellant Trustee Gus A. Paloian ("the Trustee") of two decisions of the bankruptcy court entered September 7, 2006 and November 27, 2006, respectively.[1] In an adversary proceeding, the Trustee sought to recover damages for the Bank's alleged violations of the automatic stay, § 9-207 of the Uniform Commercial Code ("U.C.C."), and § 549 of the

---

[1] Grupo Serla S.A. de C.V. ("Grupo Serla"), Editorial Comercial S.A. de C.V. ("Editorial Comercial"), Union Industrial Mexicana S.A. de C.V. ("Union Industrial), and Sergio Eduardo Guarneros Trujillo ("Guarneros") (collectively, "the foreign defendants") also appealed the bankruptcy court's decision. The foreign defendants were dismissed from the appeal on July 14, 2009.

Bankruptcy Code.[2]  This court's jurisdiction rests in 28 U.S.C. § 158(a)(1), which governs

appeals from "final judgments, orders, and decrees" of the bankruptcy court.  For the following

reasons, the bankruptcy court's decision will be affirmed in part and reversed in part.

## STANDARD OF REVIEW

On appeal, the district court reviews the bankruptcy court's factual findings for clear

error and its legal conclusions *de novo*.  *Monarch Air Serv., Inc.* v. *Solow* (*In re Midway*

*Airlines, Inc.*), 383 F.3d 663, 668 (7th Cir. 2004).  "Mixed questions of law and fact are subject

to *de novo* review."  *Freeland* v. *Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008) (citing *Mungo*

v. *Taylor*, 355 F.3d 969, 974 (7th Cir. 2004)).  A finding of fact is clearly erroneous "when

although there is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed."  *Anderson* v. *Bessemer City*,

470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985).  "[D]ue regard shall be given to the

opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P.

8013.

## BACKGROUND

### I.     Facts

In 1997, Goss Graphic Systems, Inc. ("Goss") sold a printing press for $5,948,860 to

Editorial Comercial, a Mexican entity of which Guarneros was the general administrator and

president.[3]  Editorial Comercial made a $100,000 cash down payment, granted Goss a security

---

[2]All references to section numbers herein refer to the Bankruptcy Code, Title 11, United States Code, unless otherwise indicated.

[3] Guarneros was also the general administrator and president of Grupo Serla.  Guarneros, Grupo Serla, and Editorial Comercial will be referred to collectively as "Guarneros and His Companies."

interest in the printing press, and executed a pledge giving Goss the right to request a judicial sale of the printing press if Editorial Comercial did not perform its payment obligations (the "Pledge Agreement").

To finance the remainder of the purchase price, Grupo Serla and Editorial Comercial together executed a promissory note ("the Grupo Serla Note") for $5,370,000 payable to Goss. Guarneros personally guaranteed this note. The Bank financed the sale by purchasing the Grupo Serla Note from Goss for its full amount pursuant to a Note Purchase Agreement. The Note Purchase Agreement provided that if Editorial Comercial failed to make payments on the Grupo Serla Note, Goss was liable to the Bank for 15% of Editorial Comercial's outstanding obligations. Exporters Insurance Company Ltd. ("Exporters") provided an insurance policy for the Bank's benefit to cover the remaining 85%,[4] but Goss was liable for this amount if the insurance policy did not apply. The Note Purchase Agreement further provided:

> After the purchase hereunder, following [prior] written notice to [Goss], the [Bank] may sell, transfer, pledge, negotiate, grant participations in or otherwise dispose of all or any part of the Notes purchased by the [Bank] under this Agreement to any party without increasing [Goss's] obligations hereunder, and any such party shall enjoy all the rights privileges, and obligations of the [Bank] under this Agreement with respect to such transferred notes.

Note Purchase Agreement art. VII(A).

Guarneros and His Companies failed to make payments on the Grupo Serla Note as agreed, even though the printing press was in their possession and being used to produce commercially acceptable products.[5] The Bank formally notified Guarneros and His Companies

---

[4] The policy excluded coverage for loss resulting from commercial disputes between Goss and Editorial Comercial.

[5] Guarneros and His Companies contended at trial that they did not make payments because the
(continued...)

that they were in default on July 30, 2008.  In September 1998, the Bank also notified Goss that, pursuant to the Note Purchase Agreement, Goss was required to pay 15% of the outstanding obligations, or $724,950, and $29,608.61 of accrued interest toward the repurchase of the Grupo Serla Note.  Goss made this payment on September 15, 1998.  Subsequently, Guarneros and His Companies made one payment of $75,000 on the Grupo Serla Note to Goss on October 15, 1998, which Goss forwarded to the Bank on December 21, 1998.

In May 1999, the Bank and Goss jointly sued Guarneros and His Companies in DuPage County, Illinois.[6]  The parties pled alternatively that the Bank or Goss or both were entitled to recover the amounts due and owing on the Grupo Serla Note.  On August 26, 1999, Goss made a claim under the Exporters policy for the balance due to the Bank (85% of the total amount outstanding under the Grupo Serla Note), but, after an investigation, Exporters denied coverage.  Although the Bank continued to send Guarneros and His Companies demand notices for payment on the Grupo Serla Note, it also requested that Goss pay the remaining 85% due under the Note.

On December 15, 2000, Goss and the Bank executed the Note Repurchase Agreement, which provided that Goss would repurchase the remaining 85% due under the Grupo Serla Note by delivering a promissory note ("the Repurchase Note") to the Bank for $5,675,495.12.  The Note Repurchase Agreement provided, in relevant part,

---

[5](...continued)
printing press did not meet specifications or perform as Goss represented it would.  The bankruptcy court found that Grupo Serla accepted the printing press.

[6] The complaint was originally filed by a law firm selected by Goss's general counsel, Mary Ann Spiegel.  In February 2000, Joseph Krasovec of Schiff, Hardin & Waite replaced original counsel in representing both Goss and the Bank.  Goss paid Krasovec's attorneys' fees.  Service was only obtained on Editorial Comercial.

Whereas, [Goss] and the Bank entered into a Note Purchase Agreement dated August 1, 1997 (the "Note Purchase Agreement");

Whereas, pursuant to the Note Purchase Agreement, [Goss] sold the Bank certain obligations of Editorial Comercial, S.A. and Grupo Serla, S.A. de C.V. evidenced by one promissory note in the principal amount of US$5,370,000 (the "Grupo Serla Note");

Whereas, [Goss] has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of US$805,000 plus accrued interest;

Whereas, the Bank has demanded that [Goss] repurchase the remaining 85% of the Grupo Serla Note by paying the Bank the principal amount of US$4,564,500 plus interest through December 15, 2000 in the amount of US$1,110,995.12.

NOW, THEREFORE, in consideration of the mutual promises and covenants as expressed herein, and good and valuable consideration, the Parties hereto agree as follows:

1.      [Goss] shall repurchase the remaining 85% of the Grupo Serla Note from the Bank in accordance with the terms of [the Repurchase Note].

2.      Upon the Bank's receipt of payment in full in immediately available funds of all amounts due and payable by [Goss] under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to [Goss] or as a court of competent jurisdiction shall otherwise direct.

3.      This Agreement shall become effective upon the later to occur of (I) the execution of counterparts hereof by the Parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by [Goss].

Note Repurchase Agreement. The Repurchase Note set out an installment schedule for payments to be completed by May 31, 2001. It had different interest and default interest rates than the Grupo Serla Note. The Repurchase Note also provided:

The Bank may at any time assign this Note and its rights hereunder to any affiliate, and the Bank or subsequent holder of this Note may at any time assign this Note and its rights hereunder to a financial institution, or, with the consent of [Goss] which consent shall not be unreasonably withheld or delayed, to any other person or entity, provided, however, that such consent shall not be required if any of the events in the first sentence of the immediately preceding paragraph has occurred and is continuing.

Repurchase Note at 2. The first sentence of the preceding paragraph reads,

In addition to, and without limitation of, any rights of the Bank under applicable law, if any amount payable hereunder is not paid within 5 days after the same

becomes due, there is any material adverse change in [Goss's] financial condition, there is a material default under any agreement governing indebtedness of [Goss], any petition is filed by or against [Goss] under the Federal Bankruptcy Code or similar state law or if [Goss] becomes insolvent, howsoever evidenced, the Bank may declare all unpaid principal and interest payable hereunder immediately due and payable.[7]

*Id.*

Once the Note Repurchase Agreement was executed, the Bank stopped sending Guarneros and His Companies demand notices for payments due under the Grupo Serla Note. The Bank's internal computer system reflected that the Grupo Serla Note was paid in full on December 15, 2000. On that date, however, a new commitment was set up in the system for the Repurchase Note . A Bank employee testified at trial that this was for accounting purposes, so as to avoid double-counting of assets. The notices sent to Goss reflected amounts due under and terms of the Repurchase Note.

Goss made all but the last two scheduled payments pursuant to the Repurchase Note. Thus, in addition to having earlier paid $925,728.17 under its obligations pursuant to the Grupo Serla Note, Goss paid the Bank $4,250,000 on the Repurchase Note, leaving $1,425,495.12 in principal outstanding.

In May 2001, Guarneros and His Companies agreed to sell certain assets, including the printing press, to Quebecor World Inc. ("Quebecor") for $13,000,000. The printing press was valued at $4,000,000, the highest valued single asset involved in the transaction. All assets were required to be free and clear of all liens, claims, and liabilities at closing, or else Quebecor would withhold money as necessary until the liens were removed. On June 25, 2001, Guarneros

_____

[7] The Repurchase Note also provides that Goss "expressly waives any presentment, demand, protest or notice in connection with this Note now, or hereafter, required by applicable law and agrees to pay all costs and expenses of collection." Repurchase Note at 2.

traveled to Chicago to negotiate with Goss to settle any liens or claims related to the printing press. During this meeting, Goss represented that it owned the Grupo Serla Note. Guarneros, on behalf of Grupo Serla, executed a handwritten summary of terms for agreement ("Agreement in Principal" [*sic*]) with Goss in which he would pay Goss $2,700,000 for the printing press "as is, where is," and Goss would release any security interest, pledge, or retention of title in the printing press.[8] Goss's management approved the agreement the same day. Joseph Krasovec, counsel for Goss and the Bank in the DuPage litigation, received a typewritten draft of the Agreement in Principal from Spiegel and responded inquiring why the Bank was left out of the agreement. Krasovec notified the Bank of the Agreement in Principal on July 2, 2001.

On July 5, 2001, Guarneros executed the final agreement with Quebecor for the asset sale, representing it had agreed to pay Goss $2,700,000 for the printing press so that it would be free of all encumbrances. Goss, meanwhile, engaged a lawyer in Mexico to enforce the Pledge Agreement. These efforts were unsuccessful, however, as a Mexican judge required that Goss present the original Grupo Serla Note, not a copy, and the Bank continued to hold the original. Goss informed the Bank of the Quebecor sale and its attempts to enforce the Pledge Agreement on August 9, 2001.

On September 10, 2001, Goss filed a Chapter 11 petition.[9] Goss listed the Note Purchase Agreement as an executory contract in its schedules. The Bank was not listed as a secured

---

[8] Although Guarneros testified that he considered the Agreement in Principal to be the final agreement, Spiegel testified that it was not and drafted several versions of a final agreement that were never signed.

[9] Goss had previously filed a Chapter 11 petition in Delaware in September 1999. In its schedules for the 1999 bankruptcy, Goss did not list the Grupo Serla Note as personal property and did not schedule the Note Purchase Agreement as an executory contract.

creditor. In its proof of claim filed on November 21, 2001, the Bank claimed it was owed

$1,425,495.12 in principal and $73,559.91 in interest. Even after Goss's bankruptcy filing, the

Bank continued to send notices to Goss requesting payment on the Repurchase Note.[10] On

September 20, 2001, after an inquiry, the Bank was informed that the Quebecor sale was to close

in November, that the Agreement in Principal was subject to bankruptcy court approval, and that

Goss did not believe that any of the proceeds from the Agreement in Principal would be paid to

the Bank. This was because Goss believed that the amounts it owed the Bank were a prepetition

liability that would be dealt with in the plan of reorganization.

After the Bank evaluated its potential recovery under a confirmed plan, it determined that

it would recover little, if anything, under such a plan. The Bank, through its lawyer, Mark Page,

notified William O'Connor, the Chicago-based attorney for Guarneros and His Companies, that

the Bank desired to be part of the settlement discussions between O'Connor's clients and Goss

as the Bank, not Goss, owned the Grupo Serla Note on which Guarneros and His Companies

remained obligated. On October 12, 2001, Krasovec informed the Bank that he saw a potential

conflict of interest between Goss and the Bank in future proceedings and directed Goss's

Mexican counsel in the pledge proceedings to request any documents directly from Goss. On

October 16, 2001, Quebecor issued two checks, for $1,600,000 and $200,000, payable to Grupo

Serla. Grupo Serla endorsed these checks to Goss and intended to hand them over once

Guarneros and His Companies received assurance that Goss, and not the Bank, owned the Grupo

Serla Note. To investigate further, John Adams, an agent of Guarneros and His Companies, met

---

[10] Once the Bank employee responsible for sending these notices was told by a Bank attorney not to send further notices, she ceased doing so.

with O'Connor and the Bank's representatives.[11]  At this meeting, Chicago counsel for Guarneros and His Companies suggested that the Bank sell the Grupo Serla Note directly to its makers, Grupo Serla and Editorial Comercial.  Although Adams had in his possession the two checks indorsed to Goss, after the meeting, Guarneros and His Companies decided to abandon negotiations and the Agreement in Principal with Goss and instructed Quebecor to cancel the two checks.

On November 15, 2001, Quebecor informed Guarneros that Goss had contacted it about the pledge proceedings in Mexico and indicated that Goss was still owed $5,940,000 for the press.  Quebecor decided to withhold $5,000,000 from the total sale price until it had evidence that the printing press was free of all encumbrances.  Grupo Serla responded by notifying Quebecor that the Bank, not Goss, had the collection rights on the debt, that it was working out a deal with the Bank, and that the checks indorsed to Goss should be stopped.

The Bank ultimately entered into a Note Purchase Agreement and an Amended and Restated Note Purchase Agreement (collectively, the "Union Industrial Note Purchase Agreement") with Union Industrial, a company related to Guarneros and His Companies.  On December 10, 2001, the Union Industrial Note Purchase Agreement was executed, by which the Grupo Serla Note, the Repurchase Note, the Pledge Agreement, and the Bank's proof of claim were sold to Union Industrial for $1,100,000.  Pursuant to Guarneros and His Companies' request, Goss was not informed of the deal until after it was signed.  The day it was signed, the Bank sent Spiegel, Joseph Gaynor, Goss's Chief Financial Officer, and Krasovec written notice

---

[11] Goss was not represented at this meeting, and the bankruptcy creditors' committee, bankruptcy court, and Goss's bankruptcy counsel were not aware of its taking place.

of its intention to enter into the Union Industrial Note Purchase Agreement. No copy of the agreement was sent and Goss's bankruptcy counsel, the bankruptcy court, and the creditors' committee were not notified. The Union Industrial Note Purchase Agreement closed on December 19, 2001, at which time the Bank handed the original Grupo Serla Note and related documents over to O'Connor.

Two provisions in the Union Industrial Note Purchase Agreement purported to protect Goss's interests. Section 2.2 provided that Union Industrial "assumes and agrees to perform and comply with the obligations that [the Bank] may have under the Serla Note, the Repurchase Note, the Note Purchase Agreement, the 2000 [Note Repurchase] Agreement, and the Claim, as well [as] under any and all other loan and security documents." Union Industrial Note Purchase Agreement § 2.2. Section 7.1 provided:

> Neither this agreement nor any action taken hereunder shall impair or affect in any way any rights, claims, or remedies, if any, Goss may have against Editorial Comercial, Grupo Serla, and/or Sergio Guarneros Trujillo immediately before the execution of this Agreement. Any such rights of Goss shall continue the same as if this Agreement had not been made or consummated. Notwithstanding (but without limitation of) the foregoing, [Union Industrial], on behalf of itself, all affiliates, successors and assigns, denies that Goss has any such rights and reserves all of their respective rights to deny or otherwise contest that Goss has any such rights.

*Id.* § 7.1.

Upon receipt of the Grupo Serla Note on December 19, 2001, Union Industrial informed Quebecor that it now owned the Grupo Serla Note and that, as a result, the printing press was free of any remaining encumbrances. The following day, the Bank addressed a letter to Union Industrial, memorializing that the Grupo Serla Note had been sold to Union Industrial. This provided Guarneros and His Companies with the ability to complete the Quebecor asset sale

without making any payment to Goss. Page admitted at trial that the Bank knew that its agreement with Union Industrial gave Guarneros and His Companies leverage in future discussions with Goss. The Bank did not dispute Union Industrial's representation that it owned the Grupo Serla Note in the bankruptcy court.

On January 18, 2002, Adams delivered the Grupo Serla Note and accompanying documents to Guarneros. Guarneros then took the originals with him back to Mexico.

## II. Bankruptcy Court Decision

After more than seven weeks of trial, the bankruptcy court issued its decision. It concluded that although Goss did not own the Grupo Serla Note when the Bank sold it to Grupo Industrial, Goss did have interests in the Grupo Serla Note that were property of the estate. Specifically, Goss had (1) "a right to obtain and own the entire Grupo Serla Note upon completion of its payment obligations due to [the Bank]," *In re GGSI Liquidation Inc.*, 351 B.R. at 571; (2) "the right to payment on the Grupo Serla Note from the maker to the extent of its payments to [the Bank]," *id.* at 572; and (3) the possibility of becoming "entitled to full rights of subrogation including the right to all collateral had [Goss or the Trustee] tendered or attempted to tender the remaining payments due the holder of the Grupo Serla Note," *id.* The bankruptcy court held that by selling the Grupo Serla Note to Union Industrial, the Bank altered Goss's interests in the Grupo Serla Note in willful violation of the automatic stay. Even though Goss was a debtor-in-possession, the bankruptcy court ruled that the Trustee could bring claims for a stay violation under § 362(h)[12] and, alternatively, could recover damages pursuant to the court's

_____

[12] The Bankruptcy Code has been revised and the current version of this section is now found in § 362(k)(1). As the prior version of the statute controls this appeal, the court will refer to the section as § 362(h).

civil contempt power. The sale of the Grupo Serla Note and related documents was also found to be an avoidable post-petition transfer under § 549. Finally, the Bank was found to have violated its duty under U.C.C. § 9-207. Although the bankruptcy court concluded the Trustee was not entitled to rescission of the Note Repurchase Agreement, it awarded the Trustee $1,200,000 in actual damages on Count VII, for the Bank's breach of § 9-207 and the avoidable post-petition transfer, and Count VIII, for the Bank's willful violation of the automatic stay. This amount was derived by subtracting the amount Goss owed to the Bank from the amount Goss would have received from the Agreement in Principal. The court awarded the Trustee $100,000 in punitive damages and $529,872 in attorneys' fees pursuant to § 362(h).

Judgment was also entered against Union Industrial on Count VIII for the stay violation. On Counts I, II, and III, the bankruptcy court held that Grupo Serla, Editorial Comercial, and Guarneros breached their contract with Goss by failing to pay the amounts due under the Grupo Serla Note and the accompanying agreement for the sale of the printing press. A judgment of $10,415,115 for the breach, in addition to daily interest at $1,568.77, $376,818.50 in attorneys' fees, and $13,055 in expenses, was entered against Grupo Serla, Editorial Comercial, and Guarneros.

The Bank appeals the bankruptcy court's judgments against it on Counts VII and VIII, raising nine issues for appeal. The Trustee has cross-appealed, challenging the bankruptcy court's finding that Goss did not own the Grupo Serla Note, its determination that the Trustee was not entitled to rescission of the Note Repurchase Agreement, and the amount of its award of damages and attorneys' fees.

**ANALYSIS**

## I.     Ownership of the Grupo Serla Note

The Trustee argues that the bankruptcy court erred in finding that Goss did not own the

Grupo Serla Note at the time the Bank indorsed and delivered it to Union Industrial.  He points

to various actions by the Bank to establish that the Bank admitted Goss owned the Grupo Serla

Note at that time, including (1) execution of the Note Repurchase Agreement, (2) acceptance of

the Repurchase Note, (3) cessation of collection activity on the Grupo Serla Note, (4) attempts to

collect from Goss on the Repurchase Note, (5) treatment of the Grupo Serla debt as paid off in

the Bank's computer system, and (6) acceptance of $5,175,858.50 from Goss pursuant to the

Note Repurchase Agreement.

### A.     The Note Repurchase Agreement

The bankruptcy court determined that the Note Repurchase Agreement did not evidence

any intent for ownership of the Grupo Serla Note to transfer to Goss when the Note Repurchase

Agreement was executed, instead providing that Goss was not entitled to ownership until the

Repurchase Note was paid in full.  *In re GGSI Liquidation Inc.*, 351 B.R. at 565–67.  The

bankruptcy court concluded that the recitals of the Note Repurchase Agreement, which provided

that Goss "has repurchased 15% of the Grupo Serla Note from the Bank" and that "the Bank has

demanded that [Goss] repurchase the remaining 85% of the Grupo Serla Note," Note Repurchase

Agreement at 1, did not control and instead merely indicated "how much Goss paid to date with

respect to its recourse obligations under the Grupo Serla Note."  *In re GGSI Liquidation Inc.*,

351 B.R. at 565.  It credited Page's testimony that the "wording of the recital was only a

convenient shorthand the parties had developed for referring to the more complicated repayment

transaction undertaken pursuant to Goss' endorsement of the Grupo Serla Note and Article

13

V(A)(2) of the Note Purchase Agreement." *Id.* Furthermore, the bankruptcy court relied on

Illinois law that recitals are not binding obligations unless referred to in the operative provisions

of a contract. *Id.* (citing *Brookens* v. *Peabody Coal Co.*, 143 N.E.2d 25, 27, 11 Ill. 2d 322

(1957); *Ill. Housing Dev. Auth.* v. *M-Z Constr. Corp.*, 441 N.E.2d 1179, 110 Ill. App. 3d 129, Ill.

Dec. 665 (1982)). Here, the operative provisions did not do this, instead making clear "*by

[their] explicit terms* . . . that Goss was not entitled to return of the Grupo Serla Note until it

repaid the amount of the Grupo Serla Note in full." *Id.* at 567 (emphasis added).

The Trustee contends that the Note Repurchase Agreement clearly and unambiguously

establishes that Goss became the owner of the Grupo Serla Note once the Note Repurchase

Agreement became effective, and so the bankruptcy court should not have considered parol

evidence regarding the parties' intent to conclude otherwise. The bankruptcy court, however,

considered parol evidence without deciding whether the contract was ambiguous, relying on

cases that hold that where trial testimony does not contradict or add any terms to the operative

provisions of an executed agreement, no ambiguity is required to consider parol evidence. *Id.* at

566 (citing *Dancy* v. *William J. Howard, Inc.*, 297 F.2d 686, 688 (7th Cir. 1961); *Lincoln Nat'l

Life Ins. Co.* v. *Horwich*, 115 F.2d 892, 895-96 (7th Cir. 1940); *Cinquegrani* v. *IRS* (*In re

Cinquegrani*), Nos. 89 B 7850, 89 A 0747, 1993 WL 134752, at *7 (Bankr. N.D. Ill. Feb. 1,

1993); *Linn* v. *Clark*, 128 N.E. 824, 828, 295 Ill. 22 (1920)). Although *Linn*, *Lincoln National

Insurance*, and their progeny have not been expressly overruled, a review of recent Illinois case

law indicates that they are in conflict with the majority of decisions holding that a court must

find a contract ambiguous before extrinsic evidence may be considered to determine the

contracting parties' intent. *See, e.g.*, *Bland* v. *Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir.

2005); *Sunstream Jet Express, Inc.* v. *Int'l Air Serv. Co.*, 734 F.2d 1258, 1267–68 (7th Cir. 1984) (collecting cases); *Air Safety, Inc.* v. *Teachers Realty Corp.*, 706 N.E.2d 882, 884, 185 Ill. 2d 457, 236 Ill. Dec. 8 (1999) ("[A written agreement] speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." (quoting *W. Ill. Oil Co.* v. *Thompson*, 186 N.E.2d 285, 287, 26 Ill. 2d 287 (1962) (internal quotation marks omitted)). This trend indicates that the bankruptcy court should not have considered extrinsic evidence absent a determination that the Note Repurchase Agreement was ambiguous.

Neither party argues that ambiguity exists, instead maintaining that the Note Repurchase Agreement unambiguously supports their respective positions, and the court agrees that it is not. *See Curia* v. *Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) ("[A] contract is not unambiguous just because both parties say so, nor is a contract ambiguous simply because the parties offer different interpretations of its language."). Thus, parol evidence should not have been considered. Regardless, construed as a whole, the Note Repurchase Agreement supports the bankruptcy court's conclusion that Goss did not become the owner of the Grupo Serla Note at the time the agreement became effective but was only to do so after fulfilling its payment obligations under the Repurchase Note. One recital does provide that Goss had repurchased 15% of the Grupo Serla Note by paying the Bank $805,000 in principal plus accrued interest, but, when considered in light of the remaining provisions, this recital only memorializes the amount of money Goss had paid at that point toward full ownership of the Grupo Serla Note.[13]

---

[13] The Trustee does not dispute the bankruptcy court's finding that Goss was not a 15% owner of the Grupo Serla Note on account of its payment of 15% of the amount owing at the time the Note

(continued...)

The next recital, relating the Bank's request that Goss repurchase the remaining 85% of the Grupo Serla Note, only states that a request for payments was made without specifying when the repurchase was to be complete. The time of completion is addressed instead by the first two operative paragraphs. The first paragraph of the Note Repurchase Agreement provides that the repurchase would be undertaken "*in accordance with* the terms of the [Repurchase Note]," (emphasis added), *i.e.* on a payment schedule. The second paragraph makes it clear that ownership was to pass to Goss only when the Bank received the amounts due to it under the Repurchase Note "in full in *immediately available funds*." *Id.* ¶ 2 (emphasis added). These provisions belie the Trustee's argument that the repurchase was complete when the Repurchase Note was tendered to the Bank; the repurchase could not be considered complete until all amounts owed were fully paid. Thus, although the bankruptcy court erred in admitting extrinsic evidence, it correctly concluded that the Note Repurchase Agreement "*by its explicit terms* makes clear that Goss was not entitled to return of the Grupo Serla Note until it repaid the amount of the Grupo Serla Note in full." *In re GGSI Liquidation Inc.*, 351 B.R. at 567. As Goss had not fully repaid the amount due and owing, it did not own the Grupo Serla Note at the time the Bank sold it to Union Industrial.

[13](...continued)
Repurchase Agreement was executed. *See In re GGSI Liquidation Inc.*, 351 B.R. at 567–68.

## B.     Other Evidence

The Trustee further argues that the bankruptcy court erred in finding that the Bank's actions after executing the Note Repurchase Agreement did not demonstrate that Goss owned the Grupo Serla Note at the time it was sold to Union Industrial.  The court finds no error in the bankruptcy court's conclusions.

The Bank's acceptance of the Repurchase Note did not discharge Goss from its obligations under the Grupo Serla Note.  Instead, it merely suspended these obligations until the Repurchase Note was fully paid, at which point Goss would have been entitled to a discharge of these obligations and ownership of the Grupo Serla Note.  *See* 810 Ill. Comp. Stat. § 5/3-310(b) ("[I]f a note . . . is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken . . . . (2) In the case of a note, suspension of the obligation continues until dishonor of the note or until it is paid.  Payment of the note results in discharge of the obligation to the extent of the payment."); *Keller* v. *N. Am. Life Ins. Co.*, 133 N.E. 726, 729, 301 Ill. 198 (1922) ("[A] mere promise to pay cannot of itself be regarded as an effective payment[.]").

Tender of a subsequent note may in some cases operate as payment of an original note where the evidence indicates that this was the parties' intent.  *See State Bank of Lake Zurich* v. *Winnetka Bank*, 614 N.E.2d 862, 867, 245 Ill. App. 3d 984, 185 Ill. Dec. 421 (1993).  The evidence here does not show this to be the case.  The wording of the Note Repurchase Agreement reflects the parties' intention that the acceptance of the Repurchase Note only suspended Goss's obligations under the Grupo Serla Note, as repurchase was to occur in accordance with the terms of the Repurchase Note, and not at the time of its delivery, and payment was required in full in immediately available funds before Goss was entitled to return of

17

the Grupo Serla Note. *See* Note Repurchase Agreement ¶¶ 1–2. Thus, acceptance of the Repurchase Note is not enough to establish that Goss owned the Grupo Serla Note.

Similarly, the fact that the Bank ceased collection activity on the Grupo Serla Note and instead sought payment from Goss based on the Repurchase Note only indicates that the Bank considered the obligations under the Grupo Serla Note to have been suspended by Goss's tender of the Repurchase Note. While the Bank's internal computer system did indicate that the Grupo Serla Note was paid, the Bank's explanation that this was done for accounting purposes so as to avoid double-counting of assets is a reasonable one that the Trustee cannot in good faith dispute. Thus, the bankruptcy court did not err in finding that this proferred evidence did not establish that Goss owned the Grupo Serla Note when the Repurchase Note was tendered.

Finally, although the Bank accepted $5,175,858.50 from Goss pursuant to the Note Repurchase Agreement, the Note Repurchase Agreement itself provided that Goss would only be entitled to possession (and thus ownership) of the Grupo Serla Note once the Bank received payment in full of all amounts due and owing under the Repurchase Note. The Bank does not contend that it would not have complied with this provision once all payments were made. Because Goss never completed its required payments, however, this provision never came into play and Goss did not take ownership of the Grupo Serla Note. Thus, the court cannot conclude that Goss owned the Grupo Serla Note because it partially paid the Repurchase Note.

### C. Rescission of the Note Repurchase Agreement

Rescission is available when a contract is procured by fraud or misrepresentation, is based on a material mistake, or when there has been substantial non-performance or breach of contract by a party. *Home Sav. Ass'n* v. *State Bank of Woodstock*, 763 F. Supp. 292, 296 (N.D. Ill. 1991). The bankruptcy court determined that rescission was not an appropriate remedy as

Goss was in default while the Bank had substantially performed its obligations. *In re GGSI*

*Liquidation Inc.*, 351 B.R. at 595. The Trustee now argues that, if the court concludes that Goss

did not repurchase the Grupo Serla Note by executing the Note Repurchase Agreement, the Note

Repurchase Agreement was procured by fraud or based on a material mistake.[14] For the Note

Repurchase Agreement to be rescinded based on fraud, the Trustee must establish that the

representation that it repurchased the Grupo Serla Note upon execution of the Note Repurchase

Agreement was (1) one of material fact, (2) made for the purpose of inducing Goss to act, (3)

known by the Bank to be false, or not actually believed to be true, but reasonably believed true

by Goss, and (4) relied on by Goss to its detriment. *Jordan* v. *Knafel*, 880 N.E.2d 1061, 1069,

378 Ill. App. 2d 219, 317 Ill. Dec. 69 (2007) (citations omitted). The Trustee may rescind the

Note Repurchase Agreement based on mutual mistake if he can demonstrate that both parties

were mistaken as to a material fact when the agreement was executed and that the Note

Repurchase Agreement does not accurately express the parties' true agreement. *Cameron* v.

*Bogusz*, 711 N.E.2d 1194, 1198, 305 Ill. App. 3d 267, 238 Ill. Dec. 533 (1999). For rescission

based on unilateral mistake, the Trustee must establish that "(1) the mistake is related to a

material feature of the contract; (2) it occurred notwithstanding the exercise of reasonable care;

(3) it is of such grave consequence that enforcement of the contract would be unconscionable;

and (4) [the Bank] can be placed *in statu quo*." *Id.* The Trustee does not attempt to demonstrate

these required elements nor does it appear that he could do so. Thus, rescission of the Note

Repurchase Agreement is not warranted.

---

[14] The Trustee also argues that Goss was not in default on the Note Repurchase Agreement, but instead on the Repurchase Note. Because the Repurchase Note was incorporated into the Note Repurchase Agreement, *see* Note Repurchase Agreement ¶ 1, the bankruptcy court did not err in finding that Goss was in default on both.

## II.     Property Interest in the Grupo Serla Note

Section 541 provides that the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. The scope of § 541 is broad, and "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative" is within its reach. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). Although the question of whether an interest should be considered property of the estate is one of federal law, courts look to state law in determining "whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case." *Id.* Executory contracts and claims arising from contracts entered into before the filing of a bankruptcy petition are considered property of an estate. *See, e.g.*, *Hoseman* v. *Weinschneider*, 277 B.R. 894, 899 (N.D. Ill. 2002); *In re Nat'l Steel Corp.*, 316 B.R. 287, 311 (Bankr. N.D. Ill. 2004); *In re Res. Tech. Corp.*, 254 B.R. 215, 220 (Bankr. N.D. Ill. 2000).

The bankruptcy court found that Goss had several interests in the Grupo Serla Note constituting property of the estate. Specifically, the court found that Goss had (1) the contractual right, pursuant to the Note Repurchase Agreement, to possess and own the Grupo Serla Note once all payments due and owing to the Bank under the Repurchase Note were made; (2) the right to payment on the Grupo Serla Note from its makers to the extent of Goss's payments to the Bank, pursuant to its indorsement contract and secondary liability under the Note Purchase Agreement; and (3) the right to subrogation if Goss tendered the remaining amounts due to the Bank.[15] *In re GGSI Liquidation Inc.*, 351 B.R. at 571–72. The Bank argues on appeal that the

---

[15] The Trustee mischaracterizes the bankruptcy court's findings as to what constituted property of the estate. The court did not conclude that, in addition to those rights listed above, Goss also had "various other rights and interests in the Note which constituted property of the estate." Appellee's Combined

(continued...)

20

interests the bankruptcy court identified are just definitional aspects of a contract of indorsement or surety relationship and not interests in the Grupo Serla Note itself.

The bankruptcy estate is intended to be "as inclusive as possible." Collier on Bankruptcy § 541.01. Essentially, anything of value to Goss's creditors in which Goss had an interest should be considered property of the estate. Thus, the rights Goss had to recover the amounts owed to it by Guarneros and His Companies, the makers and guarantor of the Grupo Serla Note, as identified by the bankruptcy court, whether granted by the Note Repurchase Agreement, the contract of indorsement, or otherwise, properly were found to constitute property of the estate. Recovery of the amounts owed to Goss by Guarneros and His Companies would have inured to the benefit of Goss's creditors. The Bank's attempts to create a dispositive distinction between an interest in the Grupo Serla Note and a contract of indorsement are unavailing in determining what constitutes property under § 541, although the distinction may be relevant to determining whether Goss's interests were impaired by the Bank's sale of the Grupo Serla Note and related documents to Union Industrial. While the bankruptcy court's language may have been imprecise in characterizing these interests as ones in the Grupo Serla Note, its conclusion is not incorrect that the interests listed above, which are not all directly enumerated in the Grupo Serla Note itself, are property of the estate.

On appeal, the Bank argues that its position that Goss possessed no interest in the Grupo Serla Note itself is underscored by U.C.C. § 9-318(a), which provides that "[a] debtor that has

---

[15](...continued)
Resp. & Cross Appeal Brief at 31. The court instead used this language to summarize its finding that Goss had rights in the Grupo Serla Note, namely the three rights enumerated above. *In re GGSI Liquidation Inc.*, 351 B.R. 572 ("Based on the foregoing, Goss' various rights constituted property of the estate . . . .").

sold an account, chattel paper, payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold."[16]  810 Ill. Comp. Stat. § 5/9-318(a).  The court agrees with the Trustee that the Bank has waived reliance on this statutory provision as it was not raised in the bankruptcy court.  *See Econ. Folding Box Corp.* v. *Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) ("Unfortunately for [appellant], it did not raise this argument before the district court and, as we have long held, '[i]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal.'" (citation omitted)).  Although the Bank did refer to various other sections of the UCC below, it "cannot rely on the entire UCC and leave it to the court to determine which code sections apply to [its] claim.  It is not the court's responsibility to research the law and construct the parties' arguments for them." *Id.* at 720–21.

Even were the court to find the argument has not been waived, § 9-318 would not apply in this case.  Section 9-318 did not go into effect until July 1, 2001, after the Note Repurchase Agreement was signed.  *See* 810 Ill. Comp. Stat. § 5/9-318.  While § 9-702 provides a savings clause allowing the retroactive application of § 9-318 to certain pre-effective-date transactions, *see* 810 Ill. Comp. Stat. § 5/9-702(a), it does not reach the promissory note at issue in this case. Section 9-702(b) provides that the rights, duties, and interests flowing from a transaction or lien not governed by former Article 9 remain valid after the revisions went into effect.  *See id.* § 5/9-702(b)(1).  The sale of promissory notes was not a transaction covered by the former Article 9. *See* U.C.C. § 9-318 cmt. 2.  Thus, § 9-318 does not affect the bankruptcy court's finding that Goss had interests connected to the Grupo Serla Note that are property of the estate.

---

[16] "Collateral sold" is defined to include "promissory notes that have been sold."  810 Ill. Comp. Stat. § 5/9-102(a)(12)(B).

### III.    Automatic Stay Violation

Section 362(a)(3) provides that the filing of a bankruptcy petition operates as an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The stay is intended to be broad and to protect both the debtor and creditors. *See Knopfler* v. *Glidden Co.* (*In re Germansen Decorating, Inc.*), 149 B.R. 517, 521 (Bankr. N.D. Ill. 1992) ("The most obvious purpose of the automatic stay is to protect the debtor from creditor collection efforts while the debtor attempts to reorganize, to repay debts, or to obtain a discharge of those debts. However, the stay also protects creditors by preventing the dismemberment of the estate by other creditors seeking to gain an unfair advantage over their peers."). The stay applies to "almost any type of formal or informal action taken against the debtor or the property of the estate." Collier on Bankruptcy § 362.03.

Section 362(h) allows for an award of damages for willful violation of the automatic stay. A willful violation occurs if the creditor has knowledge of the bankruptcy petition and commits a deliberate act in violation of the stay. *Price* v. *United States* (*In re Price*), 42 F.3d 1068, 1071 (7th Cir. 1994); *Will* v. *Ford Motor Co.* (*In re Will*), 303 B.R. 357, 363 (Bankr. N.D. Ill. 2003). A creditor need not specifically intend to violate the stay, *In re Radcliffe*, 563 F.3d 627, 631 (7th Cir. 2009), and willfulness can be found even where the creditor believed the actions taken were justified. *In re Sumpter*, 171 B.R. 835, 843 (Bankr. N.D. Ill. 1994).

The bankruptcy court found that the Bank "knowingly violated the automatic stay by taking steps that wiped out Goss' interest in the Grupo Serla Note." *In re GGSI Liquidation Inc.*, 351 B.R. at 573. Goss's interest in the Grupo Serla Note was impaired, as it did not retain the same rights after the sale as it had before, losing, among other things, the ability to collect from

23

Guarneros and His Companies on the Grupo Serla Note because it did not have possession of the Grupo Serla Note, its location in Mexico was unknown but last possessed by Guarneros, and the Grupo Serla Note was effectively sold to Guarneros and His Companies. *Id.* at 574.

The Bank argues, as it did below, that Goss's rights under the Note Repurchase Agreement and any interests it had in the Grupo Serla Note were not altered by the sale of the Grupo Serla Note to Union Industrial, as Goss retained the right to seek reimbursement of the amounts it had paid the Bank from Guarneros and His Companies. To the contrary, the bankruptcy court correctly found that Goss could not do this in Mexico absent possession of the Grupo Serla Note. Goss had previously attempted to enforce the Pledge Agreement in Mexico but found itself thwarted because it did not have possession of the original executed note. With the Grupo Serla Note now in the hands of an entity related to Guarneros and His Companies, Goss's ability to obtain possession of the Grupo Serla Note and present it to the Mexican courts was illusory.

Union Industrial did nominally agree to perform the Bank's obligations under the Grupo Serla Note and related documents and not to "impair or affect in any way any rights, claims or remedies, if any, Goss may have against Editorial Comercial, Grupo Serla, and/or Sergio Guarneros Trujillo." Union Industrial Note Purchase Agreement §§ 2.2, 7.1. The bankruptcy court was entitled to conclude, however, that these provisions were meaningless, "pure sophistry or perhaps the only 'fig leaf' of protection to [the Bank] that its lawyers could provide." *In re GGSI Liquidation, Inc.*, 351 B.R. at 560. The remainder of § 7.1 provided that "[n]otwithstanding (but without limitation of) the foregoing, [Union Industrial], on behalf of itself, all affiliates, successors and assigns, denies that Goss has any such rights and reserves all of their respective rights to deny or otherwise contest that Goss has any such rights." Union

Industrial Note Purchase Agreement § 7.1. Although the Bank may have intended this provision only to reserve the rights of Guarneros and His Companies to argue that Goss was not entitled to payment because of claims that the press was defective, the provision gives little assurance that Union Industrial would not impair Goss's ability to recover against Guarneros and His Companies, a right that was property of the estate.

Further evidence that the provisions of the Union Industrial Note Purchase Agreement did little to preserve Goss's rights is Union Industrial's close relationship to Guarneros and His Companies. The transaction was undertaken to allow the Quebecor sale to proceed at the least cost to Guarneros and His Companies. Once Union Industrial gained possession of the Grupo Serla Note and related documents, it notified Quebecor that the press was free and clear of all liens, allowing the asset purchase to go forward. Union Industrial was not merely a disinterested buyer in the promissory note trading market, a market the Bank maintains the bankruptcy court's decision will disrupt. The Bank ignores that in this case the Grupo Serla Note was not sold to another financial institution; it was sold to an entity related to the makers of the note. Union Industrial never sought to collect the payments due and owing on the Grupo Serla Note from Guarneros and His Companies, or for that matter from Goss. Both the Bank and Guarneros and His Companies stood to gain from the transaction to the detriment of Goss and its remaining creditors. The Bank even recognized this, admitting at trial that it knew the sale would give Guarneros and His Companies leverage in settlement discussions with Goss. The Bank thus failed to preserve the value of Goss's interests, as the transaction with Union Industrial made it virtually impossible for Goss to recover the amounts it had paid to the Bank on the Grupo Serla Note and to enforce its right to redeem the Grupo Serla Note. The Grupo Serla Note's value to the estate decreased substantially once it was in Union Industrial's hands, and thus the

bankruptcy court properly found that the sale by the Bank to Union Industrial violated the automatic stay.

The Bank's attempts to distinguish *In re Bialac*, 712 F.2d 426 (9th Cir. 1983), are unpersuasive. In *In re Bialac*, the Ninth Circuit held that a stay violation occurred when a creditor foreclosed on the interests of non-debtors in a note in which the debtor also held an interest, as the foreclosure impaired the debtor's interest in the note. *Id.* at 431–32. Similarly, here, the Bank's sale of the Grupo Serla Note and related documents, although not technically foreclosing Goss's interests, effectively prevented Goss from redeeming the Grupo Serla Note and enforcing its rights against Guarneros and His Companies. As noted above, Union Industrial's agreement to preserve Goss's rights was insufficient to do so in light of the circumstances surrounding the agreement, particularly as Guarneros had possession of the Grupo Serla Note when it was brought to Mexico.

The Bank clearly acted in its own interest and gained an advantage over other creditors post-petition by selling the Grupo Serla Note to Union Industrial without involving Goss, even though it was aware that Goss was in bankruptcy and had previously negotiated and come to an agreement regarding the Grupo Serla Note. The Bank knew it would receive little, if anything, if it continued to hold the Grupo Serla Note awaiting confirmation of a plan. It also knew that the printing press had to be free of all encumbrances in order for the Quebecor sale to occur. With these considerations in mind, the Bank opportunistically pursued negotiations directly with Guarneros and His Companies. Although the Bank has attempted to argue that it only sold its claim in bankruptcy, which would not be a violation of the automatic stay, the Bank did more, selling property in which the estate had an interest. As the bankruptcy court noted, the documents underlying the sale were entitled "Amended and Restated *Note Purchase*

26

Agreement," not "Amended and Restated *Claim Sale* Agreement." Further discrediting the Bank's argument is the fact that it received $1.1 million from Union Industrial for an almost $1.5 million claim when claims were trading at approximately ten to twenty percent of face value. Although Goss would have had to pay the Bank $1.5 million to obtain the Grupo Serla Note from the Bank in order to fulfill its end of the "Agreement in Principal," the Bank acted before the time to assume or reject executory contracts had expired. While the Bank could have applied to the bankruptcy court for modification of the stay, it did not, instead choosing a self-help remedy it thought would place it in a better position. Unfortunately for the Bank, its decision has in hindsight proven costly.

## IV.    Recovery under § 362(h)

The bankruptcy court awarded the Trustee actual and punitive damages for the Bank's willful violation of the automatic stay, alternatively under § 362(h) or its inherent civil contempt power under § 105(a). The Bank argues that the award of punitive damages was error, as the Trustee, as a corporate debtor's representative, is not an individual entitled to damages pursuant to § 362(h), and punitive damages may not be awarded pursuant to § 105(a).

Section 362(h) provides that "[a]n *individual* injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (emphasis added). The term "individual" is not explicitly defined in the Bankruptcy Code. *Consolidated Rail Corp.* v. *Gallatin State Bank*, 173 B.R. 146, 147 (N.D. Ill. 1992). The Seventh Circuit has not yet addressed whether a corporation or trustee is an individual for purposes of § 362(h). The circuits to have addressed the issue are split. Five circuits have held that "individual" includes only natural persons and not corporations, trustees, or other entities. *Spookyworld Inc.* v. *Town*

of Berlin (*In re Spookyworld, Inc.*), 346 F.3d 1, 7–8 (1st Cir. 2003); *Sosne* v. *Reinert & Duree, P.C.* (*In re Just Brakes Corp. Sys., Inc.*), 108 F.3d 881, 884–85 (8th Cir. 1997); *Jove Eng'g, Inc.* v. *IRS*, 92 F.3d 1539, 1549–53 (11th Cir. 1996); *Havelock* v. *Taxel* (*In re Pace*), 67 F.3d 187, 192–93 (9th Cir. 1995); *Johnston Envtl. Corp.* v. *Knight* (*In re Goodman*), 991 F.2d 613, 619–20 (9th Cir. 1993); *Mar. Asbestosis Legal Clinic* v. *LTV Steel Co.* (*In re Chateaugay Corp.*), 920 F.2d 183, 184–86 (2d Cir. 1990). Two circuits have held that "individual" is not narrowly limited but instead also includes corporate debtors. *Cuffee* v. *Atl. Bus. & Cmty. Dev. Corp.* (*In re Atl. Bus. & Cmty. Corp.*), 901 F.2d 325, 329 (3d Cir. 1990); *Budget Serv. Co.* v. *Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir. 1986). Courts within this circuit are similarly split, although the majority have held that a corporation is not an "individual" for purposes of § 362(h). *Compare In re Midway Indus. Contractors, Inc.*, 178 B.R. 734, 737–38 (N.D. Ill. 1995); *Consolidated Rail Corp.*, 173 B.R. at 147; *In re Glenn*, 379 B.R. 760, 762–64 (Bankr. N.D. Ill. 2007); *In re Fashions USA Inc.*, 301 B.R. 528, 529 (Bankr. C.D. Ill. 2003)*; and In re Bequette*, 184 B.R. 327, 335 (Bankr. S.D. Ill. 1995) (corporation cannot recover damages under § 362(h)), *with Martino* v. *First Nat'l Bank of Harvey* (*In re Garofalo's Finer Foods, Inc.*), 186 B.R. 414, 437–39 (N.D. Ill. 1995), *and In re A&C Elec. Co.*, 188 B.R. 975, 979 (Bankr. N.D. Ill. 1995) (corporation can recover damages under § 362(h)).

This court finds persuasive the reasoning of the cited cases holding that a corporation, or a trustee for a corporate debtor's estate, cannot recover damages pursuant to § 362(h) for willful violation of the automatic stay. The Bankruptcy Code is to be construed in accordance with the plain meaning doctrine, where the plain language of the statute is conclusive "except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.

Ct. 1026, 103 L. Ed. 2d 290 (1989) (citation omitted) (internal quotation marks omitted).

Although "individual" is not explicitly defined in the Bankruptcy Code, to find that the term "individual" includes "corporation" requires a tortured reading. Other definitions in the Bankruptcy Code demonstrate that "individual" refers to a natural person, and not a corporation or a trustee acting in his representative capacity on behalf of the bankruptcy estate. For example, "person" is defined to include an "individual, partnership, and corporation." 11 U.S.C. § 101(41). "Corporation" includes an "association having a power or privilege that a private corporation, but not an individual or a partnership, possesses." *Id.* § 101(9)(A)(I). In defining "insider," the Bankruptcy Code differentiates between an individual and a corporate debtor.[17] *Id.* § 101(31)(A)–(B). Were the term "individual" to include "corporation" within its definition, there would be no reason to differentiate between the two throughout the Bankruptcy Code. *See Consolidated Rail Corp.*, 173 B.R. at 147 ("If a corporation was an individual under the Bankruptcy Code, it would have been unnecessary for Congress to include the word 'corporation' when defining 'person' because the word 'individual' would have included corporations.").

Cases concluding otherwise ignore the plain meaning of "individual" as used in the Bankruptcy Code and instead focus on the inclusion of the damages provision in § 362, which admittedly is intended to broadly protect all debtors, not only natural persons. The legislative intent behind the other provisions of § 362 should not be imported into interpretation of § 362(h), however. *In re Chateaugay*, 920 F.2d at 186. Section 362(h) was added to the

---

[17] For additional examples distinguishing the use of the terms "individual" and "corporation" in the Bankruptcy Code, see *Jove Engineering*, 92 F.3d at 1551 & n.11; *In re Chateaugay*, 920 F.2d at 184–85.

Bankruptcy Code in 1984 as part of the "Consumer Credit Amendments," which contained provisions applicable only to natural persons. *Jove Eng'g*, 92 F.3d at 1552. "The inclusion of § 362(h) within this subtitle makes it entirely plausible that the use of the word 'individual' was intentional, and that Congress was enacting a series of measures meant to benefit only natural persons." *In re Chateaugay*, 920 F.2d at 186. The legislative history for this section does not indicate that § 362(h) was intended to apply not only to "individuals" but also to the more broadly defined term "persons." *Id.* at 185–86. Thus, finding that a corporation or a trustee on behalf of an estate cannot recover damages under § 362(h) is not "at odds with the intention of [§ 362(h)'s] drafters." *Ron Pair*, 489 U.S. at 242.

The court's conclusion that trustees and corporate debtors cannot recover damages under § 362(h) does not leave them without recourse for stay violations. As the bankruptcy court held, and the parties do not dispute on appeal, a bankruptcy court may punish a violation of the automatic stay pursuant to its civil contempt powers codified in § 105(a). Thus, the bankruptcy court's award of damages in the exercise of its contempt powers was proper. Its punitive damage award, however, will be vacated, as punitive damages are not an appropriate sanction for civil contempt. *See Cox* v. *Zale Del., Inc.*, 239 F.3d 910, 916 (7th Cir. 2001) (punitive damages can be awarded for criminal, but not civil, contempt, as punishment is not the purpose of civil contempt).

## V.  U.C.C. § 9-207

U.C.C. § 9-207 provides that "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession. In the case of chattel paper or an instrument, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed." 810 Ill. Comp. Stat. 5/9-207. This section imposes a duty of

care on an owner of a promissory note similar to that imposed on a pledgee at common law. U.C.C. § 9-207 cmt. 2. "[A]t common law, and implicitly under the Uniform Commercial Code, a creditor may assign its rights and transfer possession of collateral without knowledge or consent of the debtor, so long as the debtor's right to redeem upon payment of the debt is not impaired." *Harris* v. *Key Bank*, 193 F. Supp. 2d 707, 717 (W.D.N.Y. 2002) (quoting *Chittenden Trust Co.* v. *Marshall*, 507 A.2d 965, 969 (Vt. 1986)) (internal quotation marks omitted). The parties may agree, however, to standards by which reasonable care will be measured. U.C.C. §§ 1-102, 9-207 cmt. 2.

Illinois follows a general rule of assignability "unless assignment would materially change the duties of the obligor, increase the obligor's risk, or impair the obligor's chance of obtaining return performance." *United States* v. *Doe*, 940 F.2d 199, 204 (7th Cir. 1991). Parties may agree otherwise, *id.*, and an implied covenant of good faith will not operate to modify the express terms of the parties' contract. *N. Trust Co.* v. *VIII S. Mich. Assocs.*, 657 N.E.2d 1085, 1104, 276 Ill. App. 3d 355, 212 Ill. Dec. 750 (1995). Here, Goss and the Bank agreed that the Grupo Serla Note could be sold "to any party without increasing [Goss's] obligations" under the Note Purchase Agreement following prior written notice to Goss. Note Purchase Agreement art. VII(A). Thus, the express terms of the contract allowed the sale of the Grupo Serla Note to Union Industrial, despite its affiliation with the makers of the Grupo Serla Note, provided that written notice was given and Goss's obligations under the Note Purchase Agreement were not increased.

While the Bank did provide written notice of the sale to Goss after the Union Industrial Note Purchase Agreement was executed but before the transaction closed, notice was not proper, particularly as Goss was not provided with a copy of the agreement or informed that it would

effectively lose all its rights after the sale, and the Bank did not notify bankruptcy counsel, the bankruptcy court, or the creditors' committee of the sale. The Bank made a strategic decision not to inform Goss of the agreement until after an executed version was signed, agreeing with the foreign defendants' counsel that Goss should not be notified until an agreement was signed. Further, as already discussed, although the Union Industrial Note Purchase Agreement purported to preserve all obligations the Bank had to Goss and not to increase any obligations Goss had regarding the Grupo Serla Note and related documents, in all practical respects, Goss's rights were impaired. Thus, the sale of the Grupo Serla Note was properly found to violate § 9-207 and the Note Purchase Agreement's notice requirement.

## VI.     Recovery Pursuant to § 549

Pursuant to § 549, a trustee may avoid an unauthorized, post-petition transfer.  Avoidance is proper where (1) property was transferred, (2) the property was property of the bankruptcy estate, (3) the transfer occurred after the bankruptcy case commenced, and (4) the bankruptcy court and the Bankruptcy Code did not authorize the transfer.  11 U.S.C. § 549(a); *Krol* v. *Wilcek* (*In re H. King & Assocs.*), 295 B.R. 246, 291 (Bankr. N.D. Ill. 2003).  Transfer is defined in the Bankruptcy Code as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property.  11 U.S.C. § 101(54)(D).

Unlike § 362, which is intended to prevent creditors from dismembering the bankruptcy estate, § 549 is intended to protect creditors from unauthorized transfers of estate property in which the debtor is a willing participant.  *Garcia* v. *Phoenix Bond & Indemnity Co.* (*In re Garcia*), 109 B.R. 335, 339 (N.D. Ill. 1989) ("These are post-petition transfers in which the debtor is a willing participant, but which, though not prohibited by the automatic stay, are not otherwise authorized by the Bankruptcy Code."); *see also In re Schwartz*, 954 F.2d 569, 573–74 (9th Cir. 1992).  The Seventh Circuit has not addressed whether the two provisions are mutually exclusive, and neither party has addressed the issue.  *But see In re Schwartz*, 954 F.2d at 574 ("The law in this circuit is that violations of the automatic stay are void and that section 549 applies to transfers of property which are not voided by the stay.").

Here, allowing recovery under § 549, in addition to recovery for violation of the stay, is inappropriate.  Although the Bankruptcy Code defines "transfer" rather broadly, it is a stretch to include the Bank's actions within the definition.  Further, the purposes of § 549 would not be served by allowing the Trustee recovery under this section, as Goss did not willingly participate

33

in the transfer and impairment of its interests in the Grupo Serla Note and related documents. Instead, the Bank, a creditor, acted with Union Industrial to dismember the bankruptcy estate in violation of § 362's automatic stay. The Trustee can recover for this action as a violation of the automatic stay; recovery pursuant to § 549 is cumulative. Awarding the value of the interests impaired by the Bank's actions because avoidance is impractical amounts to double recovery for the same violation and is thus unwarranted. Thus, the bankruptcy court erred in concluding that § 549 was violated. This does not affect the damages awarded for Count VII, however, as the bankruptcy court's ruling on the Bank's violation of its duty under U.C.C. § 9-207 stands.

## VII.     Causation and Failure to Mitigate

The Bank argues that the bankruptcy court erred in awarding damages because Goss's loss was not caused by the Bank's actions, and, even if it were, Goss failed to mitigate its damages. The Bank contends that it was ready to enter a three-way deal with Goss and Guarneros and His Companies but that Goss refused to do so. Thus, it contends Goss caused its own losses resulting from the sale of the Grupo Serla Note and related documents to Union Industrial. Although Goss is not completely blameless, as it did not include the Bank in its discussions with Guarneros, this does not compel the conclusion that the Bank's actions did not damage the estate. That Goss would have been required to pay the Bank the amount owed under the Note Repurchase Agreement was appropriately considered in reaching the amount of damages; it does not establish that the loss was not caused by the Bank's actions.

Further, it is not clear from the record that Goss's damages could have been partially or completely avoided. While the Bank posits that Goss was a significant operating entity in Chapter 11 in 2001, this does not necessarily mean that Goss could have completed its repurchase obligations when notified of the Union Industrial Note Purchase Agreement. Goss's

bankruptcy counsel, the bankruptcy court, and the creditors' committee never received notice of the sale. Although there was testimony that Spiegel, Goss's general counsel, requested some modifications to the agreement by phone, it is undisputed that Goss was not fully informed of the agreement's terms as it never received a copy. The amount of time between the giving of notice and the ultimate execution of the Union Industrial Note Purchase Agreement cannot be considered enough to have allowed Goss to tender its remaining obligations under the Note Repurchase Agreement to the Bank, particularly as bankruptcy court approval would have been required for this to occur. Thus, in light of the circumstances surrounding the sale to Union Industrial, the court cannot conclude that Goss failed to mitigate its damages.

## VIII.   Actual Damages

In determining the appropriate amount of damages, the bankruptcy court used the amount Grupo Serla had agreed to pay Goss for the release of all claims Goss had to the printing press, $2,700,000, set off by the $1,500,000 Goss would have had to pay the Bank in order to obtain possession and ownership of the Grupo Serla Note. The Bank argues that the bankruptcy court should not have awarded the Trustee damages on this theory, as it amounts to only speculation and conjecture. The Trustee, on the other hand, argues that the amount of damages should be increased, as the Bank's sale of the Grupo Serla Note to Union Industrial prevented it from receiving the $5,000,000 Quebecor withheld from Grupo Serla until it received assurances that the printing press was free and clear of all encumbrances.

The facts clearly establish that Goss was damaged by the Bank's actions, which effectively prevented Goss from recovering any amounts owed to it by Guarneros and His Companies as a result of the sale of the printing press. The only issue, then, is what value should be assigned to these rights. This court agrees with the bankruptcy court's damages award, as it

properly accounts for the amount Goss would have likely recovered from Guarneros and His Companies if the Bank had not sold the Grupo Serla Note and related documents to Union Industrial.

While a damage award cannot be based purely on speculation, it also need not be shown with mathematical certainty. *BE&K Constr. Co.* v. *Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 770 (7th Cir. 1998). Indeed, some amount of speculation is allowable. *Id.* In this case, Grupo Serla was willing to pay Goss, and Goss was willing to accept, $2,700,000 for the press in exchange for the release of "any security interest, or retention of title or pledge" in the press. *See* Agreement in Principal. Because Goss remained liable to the bank for $1,500,000 and would have been required to make this payment in order to fulfill its obligations under the Agreement in Principal, the bankruptcy court properly offset the money Goss would have received by its outstanding obligations to the Bank.

The Bank's argument that the damages calculation cannot be based on the Agreement in Principal because it was a tentative agreement, relying on *PFT Roberson, Inc.* v. *Volvo Trucks North America, Inc.*, 420 F.3d 728 (7th Cir. 2005), is unpersuasive. While tentative agreements made expressly conditional on the signing of a formal document are generally not enforced under Illinois law, *PFT Roberson, Inc.*, 420 F.3d at 731, the Agreement in Principal is not being enforced as part of a breach of contract action but instead is being used as a benchmark to determine the value Guarneros and His Companies and Goss placed on the Grupo Serla Note and related documents. Coupled with Goss's subsequent tender of draft final documents with the same material terms and Guarneros's endorsement of checks totaling $1,800,000 to Goss, the $2,700,000 agreed on by the parties can reasonably be considered an accurate estimate of the

amount Goss would have recovered from Guarneros and His Companies if it, and not the Bank, had possession and full ownership of the Grupo Serla Note and related documents.

The Trustee's request that the damage award be increased is similarly unavailing. While Goss had informed Quebecor that $5,940,000 remained outstanding on the printing press in November 2001, it had previously agreed to accept only $2,700,000 from Grupo Serla to settle the debt. The $5,000,000 withheld by Quebecor from the purchase price for Grupo Serla's assets was not specifically destined for Goss; Quebecor had agreed that this money would be released to Grupo Serla once it received evidence that the printing press was free and clear of all encumbrances. The withholding of this money thus should be considered an incentive for Grupo Serla to resolve the claims against it. While this was ultimately accomplished through Union Industrial's purchase of the Grupo Serla Note and related documents from the Bank for $1,100,000, it appears highly unlikely, due to the previously agreed upon figure for such a resolution, that Goss would have received the full $5,000,000 withheld by Quebecor if Grupo Serla had continued to pursue a resolution directly with Goss. Thus, the court will not order an increase in the damages award.

## IX. Attorneys' Fees

The Trustee challenges the bankruptcy court's award of attorneys' fees, arguing that fees should not have been capped by the approved contingency fee agreement but instead that the lodestar method should have been used to determine what a reasonable fee was. As the bankruptcy court aptly explained, the Trustee's argument is unavailing.

A bankruptcy court reviewing a professional's fee application after services have been rendered generally reviews the application to determine whether the requested fees are

reasonable pursuant to § 330 of the Bankruptcy Code. 11 U.S.C. § 330; *In re Kenneth Leventhal & Co.*,

19 F.3d 1174 (7th Cir. 1994). Where a contingency fee agreement has been preapproved by the bankruptcy court, however, the approved compensation arrangement may only be modified at the conclusion of the professional's services "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). "There is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328." *In re B.U.M. Int'l, Inc.*, 229 F.3d 824, 829 (9th Cir. 2000); *see also In re Tex. Sec., Inc.*, 218 F.3d 443, 445–46 (5th Cir. 2000) ("Once the bankruptcy court has approved a rate or means of payment, such as a contingent fee, the court cannot on the submission of the final fee application instead approve a 'reasonable' fee under § 330(a), unless the bankruptcy court finds that the original arrangement was improvident due to unanticipated circumstances as required by § 328(a).").

In this case, the bankruptcy court issued an order approving the retention of Nisen & Elliott as special counsel pursuant to a contingency fee agreement on September 4, 2003. Consequently, in order to modify the fee agreement upon conclusion of the proceeding to allow Nisen & Elliott to recover attorneys' fees in an amount different from that agreed upon, the contingency fee agreement would have to be shown "improvident in light of developments not capable of being anticipated" when entered. As the Trustee has not presented any evidence to demonstrate that the contingency fee agreement was improvident, instead arguing, contrary to

authority, that § 328(a) does not apply,[18] this court finds that the Trustee's recovery of attorneys' fees was properly capped by the preapproved contingency fee agreement.

## X.     Admissibility of Bank Exhibit 87

This court reviews the bankruptcy court's evidentiary rulings for an abuse of discretion. *Alverio* v. *Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001).  "[E]ven if a judge's rulings are found to be erroneous, they may be deemed harmless if the record indicates that the end result of the trial would have remained unchanged."  *Id.*

The Bank challenges the bankruptcy court's decision to limit the admissibility of a facsimile transmittal sheet accompanied by comments made by Krasovec to a draft agreement prepared by Spiegel to formalize the Agreement in Principal.  The bankruptcy court admitted this exhibit for the purpose of establishing the transmittal of the document only, while the Bank argues that it should have been admitted without limitation.  Even if the bankruptcy court's ruling was erroneous, the error was harmless.  The same exhibit was admitted as Trustee's exhibit 26 and apparently considered without limitation.  The bankruptcy court even quoted the statement the Bank appears to argue should have been admitted without limitation in its findings of fact.  *See In re GGSI Liquidation Inc.*, 351 B.R. at 553.  Thus, despite the bankruptcy court's evidentiary ruling, the bankruptcy court considered the document not only as evidence that it was transmitted but also as evidence of what was contained in the document.  As such, any evidentiary error regarding Bank exhibit 87 was harmless.

## CONCLUSION AND ORDER

---

[18] The bankruptcy court correctly and adequately distinguished the cases cited by the Trustee in its brief.  *See In re GGSI Liquidation Inc.*, 355 B.R. 691, 705–07 (Bankr. N.D. Ill. 2006).  Consequently, its analysis will not be repeated here.

For the foregoing reasons, the judgment of the bankruptcy court is affirmed as to all aspects but liability under § 549 and the award of punitive damages. The case is remanded to the bankruptcy court to amend the judgment in conformity with this decision.

Dated: June 17, 2010          Enter: _____

                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge